United States Court of Appeals
Fifth Circuit

**FILED**
August 6, 2012

Lyle W. Cayce
Clerk

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 11-30985

D.C. Docket No. 2:10-CV-2921

U. S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FILED  SEP 1 3 2012

LORETTA G. WHYTE
CLERK

JAMES LETT,

    Plaintiff - Appellant

v.

OMEGA PROTEIN, INCORPORATED; ANNA F/V; TIGER POINT F/V,

    Defendants - Appellees

Appeal from the United States District Court for the
Eastern District of Louisiana, New Orleans

Before KING, PRADO, and HAYNES, Circuit Judges.

## JUDGMENT

This cause was considered on the record on appeal and was argued by counsel.

It is ordered and adjudged that the judgment of the District Court is affirmed.

HAYNES, Circuit Judge, concurs in the judgment only:

ISSUED AS MANDATE: 3 1 AUG 2012

A True Copy
Attest

Clerk, U.S. Court of Appeals, Fifth Circuit
By: _____
Deputy

New Orleans, Louisiana  3 1 AUG 2012

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
August 6, 2012

Lyle W. Cayce
Clerk

No. 11-30985

JAMES LETT,

        Plaintiff–Appellant

v.

OMEGA PROTEIN, INCORPORATED; ANNA F/V; TIGER POINT F/V,

        Defendants–Appellees

---

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:10-CV-2921

---

Before KING, PRADO, and HAYNES, Circuit Judges.

PER CURIAM:[*]

    James Lett brought this admiralty and general maritime lawsuit against his former employer, Omega Protein, Inc., and two of Omega's fishing vessels, the F/V TIGER POINT and the F/V ANNA. Lett asserted negligence claims, unseaworthiness claims, and claims for maintenance and cure. The district court granted summary judgment in favor of the defendants and dismissed all of Lett's claims. Lett appeals the district court's judgment. For the following reasons, we AFFIRM the judgment of the district court.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

## I. FACTUAL AND PROCEDURAL BACKGROUND

From 2007 to 2009, James Lett ("Lett") worked for Omega Protein, Inc. ("Omega") as a seaman and engineer aboard several of Omega's fishing vessels. For the 2008 fishing season, Omega employed Lett as the chief engineer aboard the F/V TIGER POINT. As the chief engineer, Lett was responsible for maintaining the engine room, which included chipping off the rust. According to Lett, on September 15, 2008, he spent several hours using a needle gun to chip the rust off of the floor of the engine room, which resulted in injuries to his back and neck. Lett did not report his injuries to Omega.

In January 2009, Lett went to Dr. Stephen West ("Dr. West") complaining of severe neck pain that radiated down his arm. Dr. West prescribed medication to Lett for his pain. In March 2009, Lett underwent a pre-employment physical. Lett did not tell the examining physician that he had neck pain or that he was taking medication for this pain. After Lett was cleared by the examining physician, Omega employed Lett as the second engineer aboard the F/V ANNA for the 2009 fishing season. As part of his duties, Lett was responsible for lifting hatch covers. According to Lett, this repetitive, heavy lifting aggravated his prior neck and back injuries. Again, Lett failed to report his injuries to Omega.

On September 2, 2010, Lett filed this lawsuit in the United States District Court for the Eastern District of Louisiana. In his first amended complaint, Lett alleged that he injured his neck and back by using the needle gun aboard the F/V TIGER POINT on September 15, 2008. He asserted that he "was forced to work approximately 5 hours on his hands and knees to chip away the rust . . . using equipment not made for such a job." He further alleged that he injured his neck and back by "working with hatch covers that were too heavy" aboard the F/V ANNA in 2009. Lett asserted negligence claims against Omega under the Jones Act, 46 U.S.C. § 30104, and he asserted unseaworthiness claims

2

against the F/V TIGER POINT and the F/V ANNA under general maritime law. Lett also sought maintenance and cure for his 2008 and 2009 injuries.

Omega filed a motion for summary judgment, seeking the dismissal of all of Lett's claims. With regard to the 2008 needle gun incident, Omega argued that it was not negligent because Mike Lombardo ("Lombardo"), Omega's safety, health, and environment director, testified that using a needle gun is a routine, safe, and simple task that does not require any training. Omega further contended that the F/V TIGER POINT was not unseaworthy because Lett testified that the needle gun was working properly. With regard to the 2009 lifting of hatch covers, Omega argued that it was not negligent because it was the company's policy that seamen should ask for assistance if they felt something was too heavy to lift, and Lett never asked for help in moving the covers. Also, Omega noted that Lett's expert, Kenneth Kaigler ("Kaigler"), found that it took only 45 pounds of force to lift the covers. Omega argued that 45-pound lifts do not give rise to claims of negligence or unseaworthiness. Last, Omega argued that, pursuant to *McCorpen v. Central Gulf Steamship Corp.*, 396 F.2d 547 (5th Cir. 1968), Lett was not entitled to maintenance and cure for his 2009 injuries. Omega asserted that Lett intentionally concealed medical facts during his pre-hiring examination, that these facts were material to Omega's decision to hire Lett, and that there was a causal link between Lett's non-disclosure and his 2009 injuries.

Lett filed a motion in opposition to Omega's motion for summary judgment. With respect to the needle gun incident, Lett asserted that Omega was negligent in failing to perform a job hazard analysis on the use of a needle gun, in failing to recognize the risks of vibration-related injury from pneumatic tools, and in failing to provide proper training to Lett. Lett argued that the F/V TIGER POINT was rendered unseaworthy by Omega's failure to train Lett and by its failure to provide Lett with a larger rust remover that allows the operator

to stand up. With respect to the lifting of hatch covers, Lett maintained that Omega was negligent in failing to perform a job hazard analysis on repetitive lifting requirements and in failing to enforce safe lifting practices. Lett contended that he was required to lift more than 45 pounds, as the hatch covers weighed an average of 85 pounds, and that these heavy lifts were "in excess of multiple maritime maximum lifting standards." Lett argued that Omega should have replaced the heavy hatch covers with the lighter, 30-pound covers found on several of Omega's other vessels. Lett asserted that the unsafe method of lifting the hatch covers rendered the F/V ANNA unseaworthy. Finally, Lett argued that Omega's *McCorpen* defense failed because Lett did not intentionally conceal medical facts and because the facts were not material.

On September 19, 2011, the district court entered an order granting Omega's motion for summary judgment. The court first determined that Omega and the F/V TIGER POINT were entitled to summary judgment on Lett's negligence and unseaworthiness claims relating to the 2008 needle gun incident. The court noted Lett's testimony that the needle gun was working properly and that nobody directed him to chip continuously for five hours. The court also noted Lombardo's testimony that the task of using a needle gun is common and safe in the maritime industry. Lombardo testified that no training is necessary and that he had never heard of any injury resulting from the vibration of a needle gun. The court concluded that "[t]his testimony establishes that Omega was not negligent and the F/V TIGER POINT was not unseaworthy."

The court next determined that Omega and the F/V ANNA were entitled to summary judgment on Lett's negligence and unseaworthiness claims relating to the lifting of hatch covers in 2009. The court highlighted Lombardo's testimony that "at Omega's orientation, the seamen are instructed to ask for assistance if they cannot lift something." The court also noted that Kaigler determined that it took only 45 pounds of pressure to lift the hatch covers. The

court concluded that Lett did not present "any evidence that Omega was negligent for not replacing the allegedly heavier hatch covers, or that the alleged weight of the hatch covers on the F/V ANNA rendered the vessel unseaworthy."

Last, the district court determined that Lett was not entitled to maintenance and cure. With regard to his 2008 injuries, the court explained that Lett did not report his injuries to Omega, continued to work for Omega in 2009, and did not demand maintenance and cure until this lawsuit. With regard to his 2009 injuries, the court concluded that Omega successfully established the three elements of the *McCorpen* defense. First, the court determined that Lett intentionally concealed his 2008 injuries because he did not tell the physician during his pre-employment physical about his neck pain. Second, the court determined that the non-disclosed facts were material to Omega's decision to hire Lett, because Arnold Nidecker ("Nidecker"), Omega's human resources manager, declared in his affidavit that "if Lett had revealed his alleged 2008 injury, he would not have been hired for the 2009 season." The court noted that Lett presented no evidence to contradict Nidecker's affidavit. Third, the court found a causal connection between Lett's non-disclosure and his 2009 injuries because "Lett's own testimony is that the 2009 injury was an aggravation of the 2008 injury." Lett timely appealed the district court's judgment.

## II. DISCUSSION

### A. *Standard of Review*

We review a district court's grant of summary judgment de novo, applying the same standard as the district court. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A "genuine" dispute exists if, based on the evidence, a reasonable jury could return a verdict for the nonmoving party. *Hamilton v. Segue Software Inc.*, 232 F.3d

473, 477 (5th Cir. 2000). When reviewing a grant of summary judgment, "we consider all of the evidence in the record but refrain from making credibility determinations or weighing the evidence." *Turner*, 476 F.3d at 343 (citation omitted). "[W]e draw all reasonable inferences in favor of the nonmoving party." *Id.* (citations and internal quotation marks omitted). "However, a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Id.* (citation and internal quotation marks omitted). We may affirm a grant of summary judgment "on any basis supported by the record." *See Rockwell v. Brown*, 664 F.3d 985, 990 (5th Cir. 2011) (citation and internal quotation marks omitted).

B. *Applicable Law on Jones Act Negligence and Unseaworthiness*

The Jones Act allows "[a] seaman injured in the course of employment" to sue his employer for personal injuries suffered as a result of the employer's negligence. 46 U.S.C. § 30104; *see Park v. Stockstill Boat Rentals, Inc.*, 492 F.3d 600, 602-03 (5th Cir. 2007). An employer is held to the standard of care of "ordinary prudence under the circumstances." *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 338 (5th Cir. 1997) (en banc). An employer "has a continuing duty to provide a reasonably safe place to work and to use ordinary care to maintain the vessel in a reasonably safe condition." 1 ADMIRALTY & MARITIME LAW § 6-22 (5th ed.) (citation and internal quotation marks omitted). "Because the amount of care exercised by a reasonably prudent person varies in proportion to the danger known to be involved in what is being done, it follows that the amount of caution required, in the use of ordinary care, will vary with the nature of what is being done . . . ." 1B-III BENEDICT ON ADMIRALTY § 21. A seaman's burden of proving causation in a Jones Act negligence claim has been deemed "slight," as a seaman must only show that "his employer's negligence is the cause, in whole or in part, of his injury." *Gautreaux*, 107 F.3d at 335.

In order to establish a claim of unseaworthiness under general maritime law, an injured seaman must prove "that the owner has failed to provide a vessel, including her equipment and crew, which is reasonably fit and safe for the purposes for which it is to be used." *Jackson v. OMI Corp.*, 245 F.3d 525, 527 (5th Cir. 2001) (citations omitted). A vessel can be unseaworthy if its "gear [is] defective," its "appurtenances [are] in disrepair," or its "crew [is] unfit." *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 499 (1971). Additionally, "an unsafe method of work may render a vessel unseaworthy." *Rogers v. Eagle Offshore Drilling Servs., Inc.*, 764 F.2d 300, 303 (5th Cir. 1985). To establish causation, a seaman "must prove that the unseaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness." *Johnson v. Offshore Express, Inc.*, 845 F.2d 1347, 1354 (5th Cir. 1988) (citations omitted).

C. *Claims Relating to the 2008 Needle Gun Incident*

1. *Negligence*

The district court granted summary judgment in favor of Omega on Lett's negligence claim relating to the 2008 needle gun incident. The court determined that Lett's and Lombardo's testimony established that Omega did not breach its duty to maintain a safe workplace, as it provided Lett with a properly working and commonly used tool to perform a simple and safe task. The court stated that Lett did not present any evidence that indicated Omega was negligent.

On appeal, Lett contends that he created a genuine issue of material fact with respect to his negligence claim. First, Lett asserts that the Job Hazard Analysis booklet of the Occupational Safety and Health Administration ("OSHA") indicates that shipowners have a duty to assess risks and hazards at the workplace, including vibration hazards, in order to maintain a reasonably safe workplace. Lett maintains that Omega breached this duty because it never

7

performed a job hazard analysis on the use of a needle gun, which is a vibrating power tool. Second, Lett points to the report of his liability expert, Captain Michael Stoller ("Stoller"), which concluded that Omega breached the standard of care in failing to: (1) perform a risk assessment on the use of needle guns; (2) establish standards and procedures for the safe use of vibrating hand tools; (3) provide training and proper protective equipment; and (4) provide alternative rust-removing equipment that allowed a seaman to work standing up.

After reviewing Lett's summary judgment evidence, we conclude that Lett failed to create a genuine issue of material fact with respect to his negligence claim. First, we conclude that the OSHA Job Hazard Analysis booklet does not create a factual dispute regarding whether Omega was negligent in failing to perform a job hazard analysis. The booklet recommends that employers conduct job hazard analyses when appropriate, such as for "[j]obs with the highest injury or illness rates," "[j]obs with the potential to cause severe or disabling injuries or illness, even if there is no history of previous accidents," and "[j]obs complex enough to require written instructions." These statements do not indicate that Omega breached its duty of care by failing to conduct a job hazard analysis on the use of a needle gun, as Lett has not rebutted Omega's evidence that the use of a needle gun is a routine, safe, and straightforward task. *See Harrison v. Seariver Mar., Inc.*, No. 02-40307, 2003 WL 342266, at *7 (5th Cir. Jan. 28, 2003) (noting that an employer's safety "manual does not require a [job hazard analysis] for routine, non-complicated jobs," and thus that the employer was not negligent in failing to conduct a job hazard analysis for the "routine, simple task of clearing the deck of hoses and storing them") (emphasis omitted).

Second, we conclude that Stoller's report does not create a factual dispute regarding Lett's negligence claim. In his report, Stoller concludes that Omega breached its duty to provide a safe work environment with respect to the use of needle guns. Stoller contends that Omega failed "to take steps to protect its

8

employees from vibration-caused injuries," and that Omega should have established safety standards and procedures for the use of needle guns. Stoller concludes that "a safety program would have protected [Omega's] employees from exposure to extensive vibration and from the kind of injury that [Lett] suffered." In support of his conclusion, Stoller cites to the vibrating power tool safety standards of various non-maritime organizations.[1] However, these safety standards are inapplicable to the instant case. The vibrating power tool safety standards cited in Stoller's report are intended to prevent injuries to the hands and wrists *caused by vibration*, such as "white or blue fingers" or "finger tingling." Here, Lett has never argued that the vibration from the needle gun caused his injuries. Instead, Lett testified that he sustained injuries to his neck and back from the awkward body position he assumed while chipping the floor of the engine room. Stoller's report does not address the industry standard for proper body positioning with respect to the use of vibrating power tools.

Third, we conclude that Lett's evidence regarding the existence of safer equipment to remove rust does not create a genuine issue of material fact as to Omega's negligence. This court has stated that a seaman who simply points to safer methods or equipment, without showing that the equipment or method used by the employer is unsafe, does not demonstrate an employer's lack of ordinary prudence. *See Salis v. L&M Botruc Rental, Inc.*, 400 F. App'x 900, 904 (5th Cir. 2010) ("The testimony in the record from the ship's captain indicates that he could not recall another individual injuring himself in such a manner or reporting such an injury. The bare existence of another transportation method by which Salis' particular injury might not have occurred, with no additional

---

[1] For instance, Stoller cites to the vibration power tool safety standards of the International Organization for Standardization ("ISO"), American Conference of Governmental Industrial Hygienists ("ACGIH"), American National Standards Institute ("ANSI"), and National Institute for Occupational Safety and Health ("NIOSH").

citations or legal arguments, cannot demonstrate a lack of 'ordinary prudence' . . . .") (footnote omitted); *see also Harrison*, 2003 WL 342266, at *5 ("Ordinary prudence is exercised when a safe procedure is used for a routine task, even when a safer procedure might exist.") (citations omitted). Here, Omega's evidence indicates that a needle gun is a safe and commonly used tool and that Omega had no reason to suspect an injury from its use. Lett has not provided any evidence that the use of a needle gun is unsafe, and therefore he failed to create a factual dispute regarding whether Omega was negligent in failing to provide alternative rust-removing equipment. Based on the foregoing analysis, we affirm the grant of summary judgment in favor of Omega on Lett's negligence claim relating to the needle gun incident.

*2. Unseaworthiness*

On appeal, Lett contends that the F/V TIGER POINT was unseaworthy because (1) Omega's crew was inadequately trained on the risks of injury associated with the use of vibration power tools and (2) Lett's use of the needle gun for an extended period of time in awkward positions made the gun unsafe for its intended purpose.

We conclude that Lett did not create a genuine issue of material fact regarding his unseaworthiness claims. First, with respect to his claim that the crew was untrained, Lett relies on the vibration power tool safety standards cited in Stoller's report. However, as explained above, these safety standards are not relevant to Lett's neck and back injuries and thus do not support his unseaworthiness claim. Second, with respect to his claim of an unsafe method of use, Lett testified that the needle gun was working properly, and Lett failed to provide any evidence that the use of the needle gun aboard the F/V TIGER POINT was unsafe. *See Phillips v. W. Co. of N. Am.*, 953 F.2d 923, 928 (5th Cir. 1992) ("[A] plaintiff must present sufficient evidence to raise a jury question whether a method of operation is unsafe, before a fully equipped vessel, with all

its gear in good working order, can be rendered unseaworthy.") (citation and internal quotation marks omitted). Lett points to the availability of safer rust-removing equipment, but this evidence alone—without evidence indicating that the needle gun is unsafe—is not enough to create a genuine factual dispute regarding unseaworthiness. *See id.* Thus, we affirm the grant of summary judgment in favor of the F/V TIGER POINT.

*D. Claims Relating to the Lifting of Hatch Covers in 2009*

*1. Negligence*

The district court granted summary judgment in favor of Omega on Lett's negligence claim relating to the lifting of hatch covers in 2009. The court noted that Kaigler determined that it took "at most, 45 pounds of pressure" to lift the F/V ANNA's hatch covers. The court stated that Lett did not present any evidence that Omega was negligent by not replacing the heavy hatch covers with the lighter covers used on some of Omega's other vessels.

Lett asserts on appeal that he presented sufficient evidence to overcome summary judgment on this negligence claim. Lett points to Stoller's report, in which Stoller concludes that Omega was negligent in failing to perform a job hazard analysis on repetitive lifting requirements, in failing to train its employees to observe lifting limits, and in failing to replace the heavy hatch covers. According to Lett, Stoller's report indicates that Lett was tasked with repetitive lifts of the hatch covers, which weighed 60 to 90 pounds, and that these 60- to 90-pound lifts exceeded the maximum lifting standards of the maritime industry. Stoller states that the lifting limits of several maritime companies and the United States Coast Guard do not exceed 50 pounds for a single person. Thus, Stoller concluded that Omega breached the maritime industry's standard of care by requiring Lett to lift the heavy hatch covers.

We conclude that Lett failed to create a genuine issue of material fact regarding his negligence claim. Even assuming *arguendo* that Stoller's report

established that the maritime industry's standard of care with respect to maximum lifting limits was 50 pounds for a single person, Lett failed to show that he actually performed 60- to 90-pound lifts of the hatch covers. Lett argues that he provided evidence that he performed two types of lifting tasks with respect to the hatch covers: (1) sliding and stacking one hatch cover onto another hatch cover, which Kaigler determined took 45 pounds of force; and (2) lifting the entire hatch cover, which weighed between 60 to 90 pounds, off the deck and placing it on top of a threshold that was at least 38 inches high. As evidence that he performed the second lifting task, Lett points to his deposition testimony, Omega's 1999 Physical Position Description for Chief Engineer ("Position Description"), Nidecker's deposition testimony, and Stoller's report. Lett contends that the district court ignored the evidence of this second lifting task.

Lett's sumary judgment evidence does not create a genuine factual dispute regarding whether he performed the second lifting task. First, in his deposition, Lett only testified to performing the sliding task. Lett described the task when he stated, "You catch a roll and you sort of catch it with this hand or this hand and you just slide it up on there." He stated that he would slide approximately three to four hatch covers until there was an opening, so that the fish could be smoothly pumped "down the hold." After the fish were pumped, Lett explained that he would use the sliding process to "[c]over the hatches back up." Lett never mentioned lifting entire hatch covers off the deck.

Second, Lett points to a paragraph in the Position Description that states: "During the offloading of the fish at dockside, the dock personnel will remove the hatches and set them on the deck of the steamer. The Chief Engineer will have to replace all 30 hatches, lifting them to the 57" height." However, the Position Description does not create a genuine factual dispute as to whether Lett performed the lifting task for several reasons. The Position Description was created in 1999 and was thus ten years outdated at the time Lett was lifting

hatch covers aboard the F/V ANNA. Further, the Position Description relates only to the position of chief engineer. Lett was second engineer aboard the F/V ANNA, and thus the Position Description does not describe his job duties. Therefore, this summary judgment evidence is too speculative and attenuated to demonstrate Lett's job responsibilities aboard the F/V ANNA in 2009. Third, Nidecker's deposition testimony indicates that Lett was not required to perform the second lifting task. When asked if chief engineers were indeed tasked with lifting the hatch covers off the deck to a 57-inch height as the Position Description states, Nidecker testified, "I've never seen it. I've never see any one person lift all of those hatches. . . . There's a number of other people that are there that do replace them."

Fourth, Lett points to a statement in Stoller's report as evidence that he performed the second lifting task. Stoller states that, during his "personal telephone conversations" with Lett, Lett described how he "would singlehandedly lift a 60- to 90-pound hatch off of the deck and place it on top of the approximately 38-inch-high hatch coaming." However, this statement is not competent summary judgment evidence as it constitutes inadmissible hearsay.[2] See Harris ex rel. Harris v. Pontotoc Cnty. Sch. Dist., 635 F.3d 685, 692 (5th Cir. 2011) ("Hearsay evidence inadmissible at trial cannot be used to create a genuine issue of material fact to avoid summary judgment.") (citation omitted). Because Lett failed to create a genuine issue of fact as to whether he performed 60- to 90-pound lifts of the hatch covers, we affirm the grant of summary judgment in favor of Omega on Lett's negligence claim.

2. *Unseaworthiness*

Lett argues on appeal that the F/V ANNA was unseaworthy because (1) Omega required him to lift the heavy hatch covers in violation of maritime

---

[2] Lett has not argued that this statement falls under an exception to the hearsay rule.

safety standards and (2) the hatch covers were in disrepair due to their weight. However, as explained above, Lett failed to create a genuine issue of material fact as to whether lifting the hatch covers aboard the F/V ANNA was unsafe. *See Phillips*, 953 F.2d at 928. We thus affirm the grant of summary judgment in favor of the F/V ANNA.

E. *Maintenance and Cure*

"Maintenance and cure is a contractual form of compensation afforded by the general maritime law to seamen who fall ill or are injured while in the service of a vessel." *Jauch v. Nautical Servs., Inc.*, 470 F.3d 207, 212 (5th Cir. 2006). An employer can rely on legal defenses, such as the *McCorpen* defense, to deny maintenance and cure claims. *Brown v. Parker Drilling Offshore Corp.*, 410 F.3d 166, 171 (5th Cir. 2005) (on panel rehearing). Under *McCorpen*, a seaman is not entitled to maintenance and cure "where the shipowner requires a seaman to submit to a pre-hiring medical examination or interview and the seaman intentionally misrepresents or conceals material medical facts, the disclosure of which is plainly desired." 396 F.2d at 549 (citations omitted). In order to establish this defense, "an employer must show that (1) the claimant intentionally misrepresented or concealed medical facts; (2) the non-disclosed facts were material to the employer's decision to hire the claimant; and (3) a connection exists between the withheld information and the injury complained of in the lawsuit." *Brown*, 410 F.3d at 171 (citing *McCorpen*, 396 F.2d at 548-49).

On appeal, Lett challenges the district court's dismissal of his maintenance and cure claim for his 2009 injuries. Lett argues that Omega did not establish as a matter of law elements one and two of the *McCorpen* defense. First, Lett contends that there is a genuine issue of fact as to whether he intentionally concealed medical information, as he argues that the examination form was not specifically designed to elicit information about neck or back pain. Second, Lett contends that there is a genuine issue of fact as to the materiality

of the non-disclosed facts, as he argues that Nidecker's affidavit is "not dispositive on the issue of whether Omega would have hired [him]."

We conclude that the district court correctly determined that Omega established the *McCorpen* defense as a matter of law. With regard to the first element of the defense, the undisputed facts demonstrate that Lett intentionally concealed medical facts from Omega. In January 2009, Lett went to Dr. West for neck pain and received medication for this pain. Two months later, Lett underwent Omega's pre-employment physical examination, which required him to fill out a questionnaire regarding his past and present medical problems. Lett did not indicate on the examination form or tell the examining physician that he was experiencing neck pain, or that he was taking medication for this pain. From these facts, Omega established as a matter of law that Lett intentionally concealed his neck pain. *See Brown*, 410 F.3d at 171-75.

Lett argues that the examination form's "Other illness or disability not listed" category was too broad to elicit information from him about neck or back pain. We reject Lett's argument. In *McCorpen*, the seaman made the same argument Lett advances here: the "Illness" category on the physical examination form "was not specific enough to suggest to [the seaman] that he would reveal [his diabetic condition]." 396 F.2d at 550. We rejected the seaman's argument, explaining that the seaman knew he was being asked about past and present illnesses and was "intelligent enough to know" that diabetes is "a serious medical problem that should be revealed." *Id.* Similarly, in the instant case, Lett knew that the purpose of the physical examination was to determine whether he was fit to be an engineer, and that his neck injury should be revealed to Omega, given the physical demands of the position of engineer.

With regard to the second element of the *McCorpen* defense, we conclude that Omega established as a matter of law that Lett's non-disclosed neck injury was material to Omega's decision to hire Lett. In *Brown*, we stated that "[t]he

fact that an employer asks a specific medical question on an application, and that the inquiry is rationally related to the applicant's physical ability to perform his job duties, renders the information material for the purpose of this analysis." 410 F.3d at 175. In the instant case, the categories of medical conditions on Omega's examination form include: "Musculoskeletal System: b. Impaired range of motion" and "Other illness or disability not listed." Although these categories do not specifically mention neck pain, the categories were "obviously designed to elicit information about [disabilities] of importance." *McCorpen*, 396 F.2d at 549. Omega's examination form elicited information from Lett about his current physical disabilities, and this inquiry was rationally related to Lett's performance of his job duties as an engineer. Thus, information regarding Lett's neck injury was material. We affirm the dismissal of Lett's maintenance and cure claim for his 2009 injuries.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.


Judge HAYNES concurs in the judgment only.